Good morning, Your Honor. If it pleases the Court, my name is Tom Schlosser. I'm here on behalf of the Hoopa Valley Indian Tribe. Ms. Barton and I have agreed to divide our time so that I would take a total of 15 minutes and she would take five. We will each try to reserve a little rebuttal time. Your Honors, the Hoopa Valley and Yurok Indian Reservations were set apart on the Trinity River precisely to enable these Indians to maintain a moderate livelihood based on taking fish. About a hundred years later, when the Trinity River Division Act was passed, it was passed on the condition that the Secretary take appropriate measures to protect fish. The Secretary has not done so, and as a result, in the years following construction of the dam, Chinook salmon production dropped by about 80 percent. More recently, the coho salmon have become endangered and are listed as threatened. As a result, Congress has enacted a series of enforcement statutes to rectify the problem, and here we have a specific one which is central to this case, which is Section 3406B23, part of the Central Valley Project Improvement Act. We'll call it the CVPIA a lot today. This is a unique statute, and in many ways, one of the key elements of the dispute here is immunized from the ordinary review that would apply under NEPA. This is for three reasons. First of all, B23 doesn't call for the usual discretionary action by the Secretary. Secondly, it calls for a directed study with its own specific standards. Third, it provides insufficient time to comply with NEPA. Insufficient time measured from when? Measured from when the recommendations are done, and thank you, Your Honor, that's the key point. The district court reads out of the statute about five lines. The five lines that refer to completing the flow evaluation study that was being conducted under the mandate of the secretarial decision of 1981. That scientific study was a 12-year study to evaluate the effect of water releases on fish habitat, and until it was finished, they didn't know what the effect would be. They were to conduct this study, and at the end of the study, they were to make a report to Congress. They had 90 days from the end of the study to make the report to Congress. This is a little off track, but since I think of it, what is the reason for the difference in your position, your meaning the tribe, your position and the interior's position? I'm not sure I can answer that properly, Your Honor. I think that interior's position is that, and this was their position below since they haven't raised it in this appeal, was that NEPA was adequately satisfied, the environmental impact statement was adequate, and therefore it's not necessary to reach this question. At least that's the way the state of California puts it in their excellent amicus brief here. And let me turn to that, because I think that it's true that if NEPA is satisfied and the Endangered Species Act, the ESA, then it may not be necessary to say this is a statute like your 1994 Westlands v. NRDC case, where you found that other provisions of the CVPIA were exempt from NEPA compliance. You may not have to do that here. The district court had several objections to NEPA compliance, one of which was that the alternatives he felt were unreasonable. He pointed to the fact that interior omitted an integrated management alternative, by which he meant an alternative that combined water releases, flow, with non-flow measures, such as side channels or bank feathering. But there's no requirement under NEPA that all these possible variations be set out, and in fact the alternatives examined in the EIS were integrated. The preferred alternative is a prime example of that, which combined the flow study recommendations with the additional mechanical work of the other alternative. Furthermore, the alternative selected clearly was selected with the idea in mind of balancing the benefits to the Trinity River against the possible harms to the Central Valley. You realize, I think, that the Trinity River Division Act allows pumping water from the Trinity River basin up over and through the mountains into the Sacramento River. So it's an out-of-basin diversion. Here the fisheries benefits were balanced. The preferred alternative involves about 52% of the river's flow to be exported to the Central Valley, and the range of alternatives was reasonable. Secondly, there's an objection to the adequacy of the description of mitigation measures regarding endangered species. This reflects two things. It reflects a confusion between the ESA and NEPA. Secondly, it reflects insistence on the kind of detailed mitigation plan, which the Supreme Court tells us is not necessary in an EIS. The effects on endangered species were assumed to be significant. This is partly for CEQA purposes, because this was a combined federal-state compliance document. But when the consultation process went through under the Endangered Species Act, the fisheries agency said there was no jeopardy to the species, and therefore they did not prescribe RPAs, reasonable and prudent alternatives, to the action. Instead, they issued an incidental take statement and prescribed RPMs, reasonable and prudent measures. Now, the reasonable and prudent measures did not change the action, and by law, RPMs can only involve minor changes. And the agencies, both the fisheries agency and the action agency, agree that the changes are minor. The plaintiffs don't agree with that, but that's the kind of fact question on which the agencies have substantial expertise. To put this into perspective, the preferred alternative only involves about a 1% change in the inflow of water to the San Francisco Bay Delta. Another NEPA objection was the failure or refusal to prepare a supplemental EIS on power reliability. But the EIS, in fact, did cover power capacity, the ability of the electric power system to serve load. And so the objection that power reliability was described mainly in terms of the price of replacement power is simply unfounded. And we have brought the environmental impact statement here. There's more to it than that. It's 20 inches of paper, and I think that part of what is hoped by the other side is that the court will be too busy to look to see whether or not these things are covered in the EIS. Because, for example, we talk about the water salinity problem in the Delta and X2 point, and there are scores of references to X2 and the effect of water releases in different types of water years on X2. This is part of why we submitted the document on CD-ROM. Is there discussion of what measures would have to be taken in order to – 20 percent of all dunes, some action is going to have to be taken because otherwise you'll go past the 0.5 kilometer. Is there discussion in the report of what action is going to have to be taken at that time to remedy or to prevent the X2 point from moving too far? Well, not precisely, Your Honor, because the modeling that suggested that in 20 percent of dunes there would be a large movement may not be the modeling that is used by the action agency. And the measures that the Bureau of Reclamation takes to prevent movement of X2 are part of the no-action alternative because there are other operations under the environmental water account and under what's called the B2 water allowance, another part of the CVPIA, which are used to adjust X2. So while the EIS describes in detail whether there would be movements using the ProSim modeling, now the ProSim modeling has been superseded by another form of modeling. And the upshot is that if movement is detected as a result of the preferred alternative, and that if is key, if movement is detected, then the action and the fisheries agencies will consult on how to respond to it. Finally, it is not true that the final EIS was not subjected to public comment. The record of decision contains reference to the hundreds of letters concerning the FEIS and includes changes, for example, on emergency operations for power, which were suggested in the public comments. If there are no further questions, I'll reserve the balance of my time. Thank you. May it please the Court, Katherine Barton for the Interior Department and the other federal officials and agencies. In this case, the United States has appealed on only one issue in this case, but that is a very fundamental issue to us because that is the one issue where we feel that the District Court infringed on the Secretary's substantive discretion regarding what the project that we were examining and that we proposed to implement is. The other issues that the District Court addressed are mostly procedural issues related to this case, and although the United States normally does not discuss its internal deliberations regarding a decision to appeal, a decision to appeal or not to appeal an issue does not constitute a concession on the legal questions, and especially here in a NEPA case where we are likely to be able to comply with the District Court order even before we would get a ruling on appeal in normal circumstances, it makes sense at times for the government to decide just to proceed and only focus on issues that truly have a substantive effect. Are you on track for the July deadline? We have notified the District Court that we do expect to be somewhat late. The Bureau of Reclamation and the State decided after the District Court decision to revise the operating criteria for the entire Central Valley project, and that will require a biological opinion on the project as a whole, including the Trinity River Division. So now we're trying to coordinate the timing of those two. At this point, we have not asked the District Court for a specific extension. We are hoping to have the final EIS by before the end of the year, but I can't provide anything definitive at this point because that coordination is still ongoing. From the 120-day period that was set in the first order, I'm starting to get the sense that maybe the District Court envisioned something less substantial than you've actually embarked upon, and he may not have realized or contemplated at that time at least. What some of these other subjects were going to require. I mean, has the time period been extended because of this project or because other things, changes in other parts of the Central Valley project have gotten entangled with these? Well, the original extension to the July deadline was what we estimated we could actually do. The District Court may have thought we could comply quicker, and the District Court was obviously concerned about trying to implement flow recommendations quickly, but to be realistic and public comment and actually be able to have a legally defensible product at the end, we felt we needed more time. Then this other factor came in that has caused us to maybe not be able to meet the July deadline, but overall be much more efficient in how we go about doing this. Actually, let me just emphasize on the purpose and need issue, it's covered very fully in our briefs and I won't go into the substance of it, but especially because the appellees have said the District Court didn't rule that, in fact, and did not address our substantive concerns and thus have waived on that issue. But I do want to say that it is sometimes confusing in the opinion exactly what the District Court ruled, but he has some very clear statements, two statements in particular that say exactly we did not. We had to look more broadly at the basin as a whole in terms of our goal, the fishery restoration goal, and we think it is very important that we have that clear to protect us, especially in the future under potential future litigation. Is that a matter of statutory construction? I think it can be looked at two ways. The District Court approached it as a matter of statutory construction that the CVPIA required us to look at to the 1984 Act goals overall. We disagree that the CVPIA did that. We think instead it was saying if that's what the Congress wanted, it could have said by this date do what the 1984 Act says, and it didn't. It said give us flows on the main stem basically, you know, the Trinity River Division. But even if it incorporated the 1984 Act goals, the Secretary has a discretion not to do everything at one time in a program, unless you see that as caught up in the timing, but I don't believe it is because the only thing we were supposed to submit by a certain time was the flow recommendations. I'd like to save the rest of our time for rebuttal. Thank you. Thank you. Good morning. Brian Houghton representing the Plaintiff Intervenor and Appalee Northern California Power Agency, or NCPA. Appalees would like to continue with the division of labor we followed in the briefing and therefore propose to split our 20 minutes between myself and Mr. O'Hanlon, who represents the water agencies that are plaintiffs, appalees, and cross-appellants. Before I turn to my remarks, I'd just like to add in response to a question from the bench that the draft supplemental EIS, we're told in the most recent filing by the government, the administrative draft is already being circulated within the government, and the final draft is scheduled to be published on March 1st of this year. I have three points that I'd like to talk about. The first concerns the district court's conclusion that NEPA, in fact, does apply to the Secretary's decision to shift hundreds of thousands of acre feet of water per year from the Central Valley Project to the Trinity River. The HOOPA assert that it's too late to talk about NEPA, that any duty to comply with NEPA evaporated, and any prior NEPA violations were excused on December 18th, 2000, when the HOOPA concurred in the preferred alternative determining how much water would be shifted. That leaves us puzzled, frankly, because on December 15th, 2000, a few days before that, the water agency plaintiffs asked the district court for a TRO to stop everything before the concurrences happened, out of concern that someone might later make exactly the argument the HOOPA is making here. The district court said it didn't think the concurrences would bar it from later setting aside the Secretary's action if NEPA violations had occurred. Then the district court asked the government whether it agreed, and the government assured the court that it did. Based on this assurance, the court denied the TRO, and the whole time the HOOPA's counsel was standing there and said nothing on this issue. The problem with the HOOPA's argument, Your Honors, is that it requires that either no major discretionary federal action occurred, or if it did occur, the NEPA violations associated with it were excused by the HOOPA's concurrence. Yet, major federal action had to have occurred. With all due respect, Your Honors, the CVPIA did not authorize the HOOPA to move 815,000 acre feet per year of water on their own. The Secretary had to do something, and that something, we submit, was major federal action. On the other hand, Congress did not say in the CVPIA that the HOOPA's concurrence would excuse any NEPA violations by the Secretary and magically transform his illegal and ineffective concurrence into a legal and effective one. I apologize, but I admit I am still somewhat adrift in all the arguments and counterarguments and so forth. But I had not understood the argument to be that it was not a major federal action. I understood the argument to be that the statute, because of its timing in particular and because of the command-type language, simply said do this, and that was why it was taken out of NEPA, because Congress says do this, period. I think Congress knows how to exempt things from NEPA when that's what it intends to do, and it sure did not say that clearly in this instance. It set a particular date, and a date that seems certainly far removed from where we are today. Well, but it also was far removed from the date of the enactment of CVPIA. It was three years and 11 months, to be more or less precise, and under the other case law that's discussed in the briefs, that's more than enough time to get the NEPA job done. The fact that the government did not does not eliminate the NEPA violation. The NEPA violation is still there, and the concurrence of the HOOPA on December 18th doesn't give them a get-out-of-NEPA-free card. The second point I wanted to address has to do with how the government addressed the project's impacts on endangered fish in the Sacramento River. The October 1999 draft EIS identified significant impacts on fish in the Sacramento, but failed to identify mitigation measures. Instead, the Department of Interior deferred to the National Marine Fisheries Service and the Fish and Wildlife Service under the ESA, and in October 2000, those agencies issued biological opinions requiring two mitigation measures called X2 and auxiliary bypass to minimize the project's impacts on the fish. Interior duly incorporated the measures into the project. Unfortunately, however, by that time, the NEPA public comment period was closed, so the public never had the chance to consider whether the measures would work and whether they might cause more harm than good. Now, counsel tells you here today, well, a lot of letters came in anyway, but the fact is NEPA is a procedural statute, Your Honor, and it requires that the notice be put into the Federal Register and you go through a certain process. It is undisputed on this record that that did not occur here, so the fact that they got a few letters in from the public about this does not cure the NEPA violation. Ordinarily, the way to solve the problem is to create a new draft EIS and recirculate it for public comment, but this was not done here. The district court concluded this course of conduct violated NEPA, and the government did not appeal that ruling. That's not surprising, because the government was well aware of the NEPA risk they were taking. An internal memo from 2000 shows that the government officials expressly recognized the NEPA problem. They called it the dormant NEPA issue at the time the mitigation measures were being developed. They recognized that recirculation of the draft EIS was the way to solve the problem. They conclusively decided to forego recirculation, keep the measures to solve the ESA problem, and, as they put it, live with the NEPA issue. Now, true to their word, the government is living with the NEPA issue as we speak, by preparing and recirculating a supplemental EIS, correcting the flaw. For their part, the HOOPA argue that NEPA allows agencies to prepare draft EISs concurrently with ESA studies. We agree, but that's not what happened here. The HOOPA also argue that the X2 mitigation measure was insignificant, and therefore no assessment of its impacts was required. Now, this one puzzles me as well, Your Honors, because if it was insignificant, then why did the Fish and Wildlife Service say it was necessary, their word, not mine, to mitigate the significant impact on fish in the Sacramento, and required, again, their word, not mine, to avoid an ESA violation? It seems to me that if something is necessary to alleviate a significant impact, that something is itself significant. And that's before we even start talking about the negative side effects on water usage and power generation that were never addressed either. The HOOPA makes similar arguments with respect to the auxiliary bypass measure, and those should be rejected for the same reason. There, in particular, the National Marine Fishery Service recognized in their biological opinion that what they were recommending was going to have a substantial impact on power output. So that really should have caught the eye of Interior, particularly since by that time they had received a letter from their sister agency, the Department of Energy, saying, wait a minute, in light of the California energy crisis, there's a lot more to this project than we thought. You've got to consider power system reliability, which is my last point, Your Honors. In light of the energy crisis that was pointed out to Interior by the Department of Energy, the government should have assessed the project's impacts on power system reliability. The district court ruled the government's failure to do so violated NEPA, and again, the government has not appealed that ruling. The HOOPA assert that the government thoroughly analyzed the reliability impacts of the various alternatives on power output. Their citation for this assertion, Your Honors, is ER 345 through 355. Now, you can scrutinize those pages, and I invite you to do so. The only one I submit that has anything to do with this issue is page 346. On that page, you'll find two sentences in one paragraph telling us that, and this is the final EIS, by the way, telling us that power alerts have happened and that expected construction of additional generating capacity is anticipated to help avoid such alerts in the future. One searches the record in vain, Your Honor, for any evidence that there was an assessment of how the preferred alternative, how often it would cause the lights to go out or whether it would cause the lights to go out or not, now or in the future. The HOOPA say, don't worry, that's unlikely. Although that's in tension with recent statements by California officials on the subject, what's important for this Court's test today is that under NEPA, that assessment must be made by the government in the NEPA process in the first instance, and that process must include the illuminating light of public input. Was there evidence that there's conflict or competition between the needs of spilling water for fish purposes and spilling water for power generation purposes? Yes, Your Honor. Are there coincidental uses where they spill water for power, which puts more water down below for the fish, or is there? Well, what happens... Who has the final word on who wins on those competitive uses of that water? Interior will have the final word when they do it in a legal fashion according to NEPA, and they will make the decision about who gets what water. The outcome of the NEPA process may seem obvious to those who are not responsible for keeping the lights on, Your Honors, but for those like NCPA who do bear that responsibility, it is not quite so easy to be sanguine. I turn it over to Mr. O'Hanlon. Good morning. May it please the Court, my name is Daniel O'Hanlon. I represent the appellees and cross-appellants, Westlands Water District, the San Luis and Delta Minota Water Authority, and the San Benito County Water District. This morning I would like to address and focus my arguments on the District Court's holding that the alternatives analysis in the environmental review was inadequate. The District Court, in its opinion, used some extraordinary language in its conclusion. In part, the Court said, when the EIS scoping to define the purpose of the TRFES began, the tribes participated and their lawyers stood by while the County of Trinity persuaded the EIS management team to unfairly and unlawfully narrow the purpose and scope of the EIS. Such action seeking to limit informed decision-making for the sake of expediency has no place in the NEPA process. The Court went on to say... I read that and, frankly, I wasn't entirely sure what it meant. Your Honor, I would welcome the opportunity to explain that. I would welcome that explanation. The genesis of that remark is a document in the record. It's in the excerpts of record at ER 1438 to 1443. And this is a copy of the document. And what it is is a May 10, 1995, memorandum from counsel for Trinity County, Mr. Greg Thomas, who is an environmental lawyer here in San Francisco, who was retained by Trinity County to advise it regarding the environmental review process. And what he says in this memo is what the District Court ultimately held. What he says in response to... He had been hearing discussions among the various members of the EIS team about what their scope was, their planned scope for this environmental review document. And what Mr. Thomas did in his memo is go through the governing law. He refers to CBPI Section B23. He also refers to the 1984 Act, the Fish and Wildlife Management Act. And what he says, and I think this is critical and it's echoed in the District Court's opinion, is that it would be imprudent to scope the EIS to exclude consideration of the types of strategies specifically mentioned in PL 98-541, and that's the 1984 Act, to the extent that these bear upon the efficacy and optimality of various flow alternatives. And I'm quoting from the excerpt of Record 1441. What he was saying there, in essence, is not that Interior was bound to implement every element of the 1984 Act, which calls for a multi-component approach to restoration of fisheries in the Trinity Basin, including restoration of the main stem, including restoration of tributaries, and including increasing the effectiveness of the hatchery. What he's saying there is in establishing what would be permanent in-stream flows, and that's key, permanent in-stream flows, to the extent that what flows are needed would be affected by other recognized restoration measures and approaches laid out by Congress and mandated upon the Secretary in the 1984 Act. To the extent those flows would be affected by those other measures, then you should not scope your environmental review to eliminate consideration of those other measures. That advice was rejected. Trinity County itself, and the staffer at Trinity County named Mr. Stokely, and this is again in the excerpts of Record following this memo, vociferously objected to this advice. He said, we're not going to follow that advice, we disagree with that approach, and ultimately his view prevailed. And so what we had then was a purpose and scope in the document, but ultimately emerged in 1999, in October 1999, when the draft EIS came out, was a purpose and scope that was limited to restoring and maintaining natural production of anadromous fish on the Trinity River main stem downstream of Lewiston Dam. And what was wrong with that purpose and scope in terms of the overall restoration approach? First, it focused on natural production only, so it was limiting a role for how the existing hatchery might play a role in restoring fisheries on the Trinity. Second, it was focused on the main stem only, so there wouldn't be any consideration, for example, of measures that might be pursued on the south fork of the Trinity River, which is itself a major river, that could contribute to the restoration goal. And the restoration goal, the overall restoration goal, is one laid out by Congress in the 1984 Act to restore fish and wildlife to the level approximating where it was when the Trinity River division was built. As a result of that narrow scope, and the purpose and scope, of course, this has great effect on what alternatives analysis has ultimately conducted, because the agency conducts its analysis with respect to that scope. And the key failing of the alternatives analysis is that it does not analyze levels of flows in combination with other measures that could reduce or change the need for flows. And this is my own ignorance in large part, but I understand there are non-flow measures, and there are non-flow measures indeed that are incorporated within the preferred alternative. What exactly are we talking about here that wasn't put on the table? Well, the Court is correct. The preferred alternative ultimately does include watershed protection elements. The key point, though, is in terms of the analysis that was done, they looked only at a so-called flow alternative, which is basically taking the recommendations from the June 1999 report, but not including any measures to address sediment that would come into the river in terms of assessing what level of flows are needed. They specifically say in the alternatives analysis we did not include as part of the analysis of the flows needed any measures to reduce the amount of sediment. And that's critical because the justification for the flows and level of the flows that were required in part is what water is needed to cleanse the gravel of the fine silt that otherwise washes into the river. And so while they did add that component afterwards as part of the preferred alternative that was ultimately adopted, they never included that and specifically said they weren't including that in their analysis of what flows were needed. And that is reflected in the alternatives analysis discussion, which is included in the excerpt of record at page 178. It expressly says they looked at it as a stand-alone factor. This Court, in a number of decisions, has said that the touchstone of its inquiry concerning alternatives analysis is whether the EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation. So ultimately that is the test. And the answer here is it did not. And it did not because it excluded from consideration recognized available known elements that could have accomplished the restoration objective at a reduced cost in terms of released in-stream flows. Talking here about fish hatcheries or what is it that... It could be, for example, Your Honor, one that we just mentioned briefly, watershed protection. Old roads that were used to log the forests in Trinity Watershed, which need to be upgraded and maintained to prevent the silt from washing off and soil from washing into the river. It could be using the hatchery to increase the effectiveness. There are certainly concerns with hatcheries in terms of impacts on genetic stock and so forth, but science has come along the way and there are ways to manage and use the hatcheries more effectively. It could be harvest management, improved harvest management. It could be predator control. Different ways of trying to, in combination, accomplish the overall restoration goal while at the same time allowing for a reduced level of releases to the Trinity River because the higher the releases to the Trinity River in terms of the impact on the Central Valley Project, the less then that is available for diversion to the Sacramento Valley. You're all over your time. Thank you. Thank you. Do you reserve some time for rebuttal, right? Okay. I'd be happy to respond to the Court's questions, but I have several points to bring up in rebuttal if there's time. First of all, on the question of NEPA and concurrence, several things. The flow study was a scientific study. It makes no sense to do a study on a study, and when you look at B23A, you will see that Congress gave specific standards, said complete this study. It was eight years in progress at that point. There were four more years to run. There was no reason to do an impact study. When you say it makes no sense, that's not the statutory test, right? You're correct, Your Honor. Does it make sense? Perhaps I should put it this way, that it's not a major federal action to issue this study. What becomes a major federal action is when the Secretary makes a decision in the record of decision, and that is the reason the district court denied the TRO. The Interior hadn't taken an action, and it is before the action that they must comply with NEPA, not before they complete a particular study that Congress directs be done. With regard to the deferred mitigation argument, again, this is just denying what's in the EIS documents, and this is the draft and final EIS and the flow study. It is impossible to look at that and believe that the agency did not take a hard look at the consequences of these issues. Mr. Houghton mentioned the auxiliary bypass issue, for example. There's a specific thematic response, a section of the final EIS, responding to issues concerning the power effects of auxiliary bypass, and what that shows is that the preferred alternative involves less use of auxiliary bypass, than does the existing conditions, and so it is a positive effect. This is laid out in the final EIS. With regard to the standards for supplementation, the standards for supplementation are in the CEQ regs, and as the Supreme Court teaches us in the Marsh case, these are issues on which the agencies have substantial expertise, and the court should look at whether or not the agency's decision about the significance of the new information and how accurate that information is, and whether or not it bears on things that haven't already been considered. The court should defer to the agency's decision unless it is arbitrary and capricious, and the district court did not find it to be arbitrary and capricious. With regard to the power effects, we're dealing here with an action which involves less than four-tenths of one percent of the output of the Central Valley Project in electric power. Interior examined the power effects very carefully. There's an entire volume in there of the power appendix, and there are statistics for the changes in the capacity of the system to meet load. Interior took the necessary hard look. With regard to Mr. O'Hanlon's argument, based on some correspondence out of the administrative record in 1995, several things are significant about that. First of all, the fact that there's disagreement within the agency is a good thing. It helps to show that the agency was really examining the issues. That's what happened here. Secondly, the memorandum he talks about came before Congress amended the 1984 Act in 1996 in a way which clarified the possible role of hatcheries and clarified that natural production and harvestable fish for the Indian subsistence right and for non-Indian fishermen was an objective. Therefore, the secretary's decision on purpose and need was well within his discretion, particularly in light of statutes enacted after that memorandum was written. The record of decision makes clear that the other activities in the watershed, road decommissioning was mentioned, are ongoing. They are part of the no-action alternative. And the claim that things like sediment management weren't integrated within the alternatives that were examined is simply wrong. When you look at the EIS, and it's an excerpt of record page 214, you'll see that the amount of sediment, of gravel, to be added to restore gravel trapped by the dam varies depending on the alternative chosen. There were lower flow alternatives chosen. There was what's called the state permit alternative, and there was the no-action alternative, both of which involve much less water than the fish require. The district court should be reversed. The implementation of the flow study is mandatory, and the agency took the necessary hard look. Thank you. Thank you. We thank all counsel who participated in this argument. Now submitted for decision, then, and the panel will stand in adjournment for the day. Thank you. Thank you.
judges: Goodwin, Tashima, Clifton